UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION – DETROIT

In re:

    CLINTON J. WESTOVER,                      Case No. 12-58870
                                                        Chapter 7 Proceeding
            Debtor.                                         Hon. Walter Shapero

_____/

OPINION DENYING CREDITOR'S MOTION TO DISMISS CASE

      The matter before the Court is Oxford Bank & Trust, L.L.C.'s ("Creditor") Motion to Dismiss Clinton Westover's ("Debtor") case pursuant to 11 U.S.C. § 707(b)(3)(A) and (B). The Creditor argues that the Debtor filed his Chapter 7 petition in bad faith and that the totality of the circumstances of the Debtor's financial situation demonstrates abuse. For the reasons set forth in this opinion, the Court concludes the Creditor has failed to meet its burden of proof and its Motion to Dismiss is denied.

                                  I.    PROCEDURAL BACKGROUND AND FACTS

      On September 12, 2008, the Debtor signed a purchase agreement with the Creditor to purchase a mobile home located at 351 N. Squirrel Road, Site #178, Auburn Hills, Michigan 48326 (the "Home"), the balance being collateralized by a security interest in the Home. At the time of the purchase, the Debtor and his soon to be ex-wife, Denise Westover, were in the process of a divorce. Ms. Westover had initially contacted Thomas York, a representative of the Creditor, seeking to obtain financing for the purchase of the Home. She did not have sufficient credit to do so and she eventually asked the Debtor to assist her. It was suggested by Mr. York that, due to Ms. Westover's poor credit, it would be best for the Debtor to purchase the Home individually. Debtor did so with the understanding that Ms. Westover and all or some of their

1

children would occupy the Home and she would make the payments to the Creditor on the loan, as well as the rent payments for the site at the mobile home park. To memorialize that agreement, on September 17, 2008, Ms. Westover signed a lease agreement in which she agreed to lease the Home from Debtor for seventeen years. The lease payments were in the same amount as the note payment and she paid the lease/loan payments directly to the Creditor. The lease was intended to last for the same length as the loan term, and it was intended that after the loan was paid off the Debtor would transfer the Home to Ms. Westover for $1.00.

Ms. Westover made all of the required payments on the Home from September 2008 until December 2011. In January 2012, Ms. Westover informed the Debtor that she could no longer afford the lease/loan payments on the Home because she had experienced a decrease in income and the lot rental payments had increased, and, therefore, she would be moving out of the Home. Ms. Westover's January 2012 payment to the Creditor "bounced."

Shortly thereafter, Advance Finance, LLC, an agent for the Creditor, contacted the Debtor to inform him that Ms. Westover's check had "bounced." The Debtor informed Corina Westover[1], an employee of Advance Finance, LLC, that Ms. Westover was moving out of the Home and a meeting was set for February 1, 2012 to discuss the matter. Corina Westover requested the Debtor's current income statements, which he provided to her. During this time period, the Debtor was renting a house for $1,400.00 per month.

Present at the February 1, 2012 meeting were the Debtor, Corina Westover, and Tammy Miller, another agent of the Creditor. In her affidavit, Corina Westover stated the following: (1) the Debtor explained that he was not aware that the January 2012 payment "bounced;" (2) his ex-wife was moving out of the Home by the middle of February and that not receiving the rental income would cause him economic hardship; (3) the Debtor was going to move into the Home,

---

[1] Corina Westover is not related to the Debtor or Ms. Westover.

but he needed some time to get his financial affairs in order before doing so; (4) after that meeting, she sent an email to the Creditor with a copy to Mr. York explaining the Debtor's financial situation and stating Debtor's representation that he would be moving into the Home; (5) after running a credit report and completing a debt to income analysis, she determined that Debtor would be eligible for a payment deferral and term extension based on his representation that he would be moving into the Home; and (6) the Debtor would only be eligible for such if he did move into the Home. The Creditor agreed to an extension agreement with Debtor, under which the February and March 2012 payments would be deferred until the end of the loan period and normal payments would commence with the April 2012 payment.

On February 2, 2012, the Debtor met with Mr. York to bring in the January 2012 payment and to sign the extension agreement ("Extension Agreement"). The Extension Agreement did not refer to the Debtor moving into the Home. On February 7, 2012, the Debtor signed an authorization for the Creditor to withdraw the mortgage payments from his account at Intouch Credit Union.

The Debtor testified that he discussed the possibility of moving into the Home with his family shortly after the meeting with Creditor's agents, but he ultimately decided that it was too small because he had four people in his household, along with two additional adult children who stayed with him sporadically. Instead, it was decided that the Debtor's daughter, Bryana Westover, who had been living in the Home with her mother, would stay in the Home and would make the lease payments to the Debtor (pursuant to the same lease agreement between the Debtor and Ms. Westover).

On February 15, 2012, only thirteen days after entering into the Extension Agreement with the Creditor, the Debtor applied for a V.A. mortgage loan with Main Street Bank for the

3

purpose of purchasing a new home. The Debtor and his fiancé had been looking for some time to buy a home and that search was apparently accelerated when he was informed by his landlord that his rental house was in the process of foreclosure and he would need to vacate it. On February 28, 2012, the Debtor entered into an agreement to purchase a home located at 580 S. Grey, Auburn Hills, Michigan ("Grey Property") for $150,000.00. The closing was set to take place on April 13, 2012. The purchase agreement called for an earnest money deposit of $2,500.00. On March 1, 2012, the loan file was transferred from Main Street Bank to Flagstar Bank, and Flagstar Bank ultimately processed the loan and Main Street Bank financed it, with Flagstar Bank being the servicer. On April 9, 2012, the Debtor consummated the purchase of the Grey Property, entering into a promissory note and mortgage calling for monthly payments of $776.37 per month for principal and interest, and a total of $891.79 with escrow payments.

The automatic payments to the Creditor from the Debtor's account for April and May 2012 cleared. Thereafter, the Debtor's daughter and her boyfriend (who were occupying the Home) failed to make the required payments to the Debtor, and the June 2012 automatic payment from the Debtor's account "bounced." Advance Finance, LLC contacted the Debtor about the payment and the Debtor made an appointment with Mr. York to discuss the issue on June 9, 2013. At that meeting, the Debtor told Mr. York that he had not moved into the Home because it was too small and that he had purchased the Grey property. He also told Mr. York that he was experiencing financial hardship because his daughter lost her job and could not make the payments on the Home, and, with his own payment on the Grey Property, he could not afford to make the payments on the Home. The Debtor and Mr. York discussed the possibility of the Debtor leasing or selling the Home. It was determined that the Home was worth less than the amount owing to the Creditor, and the Debtor did not lease the Home to any third party. Neither

4

12-58870-wsd    Doc 77    Filed 11/26/14    Entered 11/26/14 10:29:43    Page 4 of 15

the Debtor nor his daughter made any more payments to the Creditor, though the Debtor's daughter continued to live in the Home.

On July 27, 2012, the Creditor sent a default notice to the Debtor. On August 15, 2012, the Debtor filed his Chapter 7 bankruptcy petition. On August 27, 2012, the Creditor sent a repossession and opportunity to cure notice to the Debtor, noting the loan balance to be $50,782.39. On August 30, 2012, the Home was physically repossessed by the Creditor. The Creditor claims that the Home was legally abandoned, and that the Debtor had come into the Advance Finance, LLC office asking what would happen if he filed for bankruptcy relief. The Debtor did not inform anybody that he in fact previously filed a Chapter 7 bankruptcy petition on August 15, 2012.

On November 9, 2012, the Creditor filed a complaint against the Debtor in the Oakland County Circuit Court for breach of contract and claim and delivery. The Debtor was served with the complaint on November 19, 2012. The Creditor states it first learned on November 30, 2012 that the Debtor had filed for bankruptcy relief, by the way of a phone call demanding that it dismiss the lawsuit. The Creditor claims that the Debtor listed the wrong address for the Creditor in his bankruptcy petition and notice thereof was not timely received.[2]

In his bankruptcy schedules, Debtor indicated that (1) he was employed as a machinist for some 8 months; (2) he was earning gross monthly wages of $5,860.00 and had a net income of $4,073.00 (which apparently included an averaged overtime amount); (3) he was single and had a dependent 14 year old daughter; (4) he had monthly expenses totaling $4,073.00, including his $982.00 monthly mortgage payment on the Grey Property. His Schedule A shows

---

[2] The Creditor was listed on Debtor's Schedule D and the Matrix, with an address of 1111 W. 22nd St., Suite 800, **Oak Park**, Illinois, **60525**, and Creditor was sent a notice of the 341 Meeting of Creditors to that address. The address listed for the Creditor on the Extension Agreement of February 2, 2102, was 1111 W. 22nd St., Suite 800, **Oak Brook**, IL **60523**.

5

12-58870-wsd    Doc 77    Filed 11/26/14    Entered 11/26/14 10:29:43    Page 5 of 15

ownership of the Grey Property and the Home. His Schedule B lists the mortgage on the Grey Property of $153,225.00; a security interest in his automobile in favor of Intouch Credit Union on a debt of $20,979.00; a security interest held by the Creditor on the Home with a balance of $50,782.00; and the lot rent for the Home of $456.00 per month. His Schedule F lists two separate debts to Intouch Credit Union, totaling $8,807.00. The Debtor received a Chapter 7 discharge on November 20, 2012. On December 13, 2012, the Creditor filed a Motion to Reopen the Debtor's bankruptcy case, and, after holding a hearing and an evidentiary hearing on the matter, the Court entered an Order reopening the case on May 9, 2013. That Order provided that the Creditor had 21 days to file an adversary proceeding.

On May 29, 2013, the Creditor filed an adversary complaint against the Debtor seeking a determination that the debt owed to it by the Debtor is non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A) and also asserting, among other grounds, that the case should be dismissed under 11 U.S.C. § 707(b)(3). As to the § 707(b)(3) count only, the Debtor is here seeking summary judgment. On December 27, 2013, the Creditor filed the pending Motion to Dismiss the Debtor's case pursuant to 11 U.S.C. § 707(b)(3). The Debtor filed a Reply to the Creditor's Motion to Dismiss on January 10, 2014. The Court held an evidentiary hearing on the matter on June 25, 2014, and the parties submitted post-hearing briefs. Further proceedings on the 11 U.S.C. § 523(a)(2)(A) count are deferred pending the decision on this matter.

## II. DISCUSSION

A bankruptcy court may dismiss a Chapter 7 case where the debts are primarily consumer debts if the court finds that granting a discharge would be an abuse of the Bankruptcy Code. Section 707(b)(1) and (3) of the Bankruptcy Code provide:

(1) After notice and a hearing, the court, on its own motion or on a motion by the United States Trustee, trustee (or bankruptcy administrator, if any), or any party in interest, may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts if it finds that the granting of relief would be an abuse of the provisions of this chapter . . . .

\*\*\*\*

(3) In considering under paragraph (1) whether the granting of relief would be an abuse of the provisions of this chapter in a case in which the presumption in subparagraph (A)(I) of such paragraph does not arise or is rebutted, the court shall consider–

(A) whether the debtor filed the petition in bad faith; or

(B) the totality of the circumstances (including whether the debtor seeks to reject a personal services contract and the financial need for such rejection as sought by the debtor) of the debtor's financial situation demonstrates abuse.

11 U.S.C. § 707(b).

Section § 707(b)(3) specifically prescribes two methodologies when assessing whether a case should be dismissed for abuse. First, in accordance with § 707(b)(3)(A), a debtor's case is to be dismissed when the Court finds that the debtor filed their petition in bad faith. Second, under § 707(b)(3)(B), a case is to be dismissed when the totality of the debtor's financial circumstances demonstrate abuse. These two methodologies are set forth in the disjunctive, and thus, a finding of abuse under either will necessitate the dismissal of a debtor's case under § 707(b)(1).

*In re Webb*, 447 B.R. 821, 824 (Bankr. N.D. Ohio 2010).

It is not disputed that the debtor is an individual or that his debts are primarily consumer debts.

A.  Bad Faith under Section 707(b)(3)(A)

The Creditor argues that the Debtor acted in bad faith in his filing for Chapter 7 relief and that the Debtor created a scheme to avoid paying his debt to the Creditor while procuring a new home for himself and his family.  The Creditor claims that the following facts establish that the Debtor acted in bad faith: (1) the Debtor represented to the Creditor that he would move into the

7

Home when he sought the extension from Creditor and the Creditor relied on that representation in granting the extension; (2) thirteen days after the extension was granted, the Debtor applied for a V.A. loan to purchase the Grey Property; (3) in applying for that loan, the Debtor submitted a copy of the lease he had with his ex-wife and represented that he had rental income, despite the fact that his ex-wife was in default; (4) in applying for that loan, the Debtor represented that he was not in default on any other debt, despite the fact that he had only thirteen days earlier signed an extension agreement with the Creditor; (5) the Debtor purchased the Grey Property despite the fact that he could not afford to pay for his other obligations; and (6) through the time the Debtor filed his bankruptcy petition, he did not default on any of his other obligations other than his obligation to the Creditor.

Although various iterations of factors have been approved in reviewing for bad faith, there is no clearly articulated standard for a bad faith analysis because, as the Sixth Circuit noted, the 'facts required to mandate dismissal based on a lack of good faith areas varied as the number of cases.' *Indus. Ins. Serv., Inc. v. Zick (In re Zick),* 931 F.2d 1124, 1127 (6th Cir.1991) (citing *In re Bingham,* 68 B.R. 933, 935 (Bankr. M.D. Pa. 1987)) (other citations omitted)). "[G]ood faith is an amorphous notion, largely defined by factual inquiry. A case must pass the smell test to avoid dismissal. *Merritt v. Franklin Bank, N.A. (In re Merritt),* 211 F.3d 1269 (6th Cir. 2000) (citing *Morgan Fiduciary, Ltd. V. Citizens & S. Int'l Bank,* 95 B.R. 232 (S.D. Fla. 1988)).

In *Zick*, the Sixth Circuit held that the circumstances identified as constituting "cause" for dismissal are not exclusive and that "lack of good faith is a valid basis of decision in a 'for cause' dismissal by a bankruptcy court." *Zick*, 931 F.2d at 1127. Although the Bankruptcy Code does not explicitly state that a Chapter 7 debtor must file in good faith, this concept is implicit in the basic purpose of bankruptcy relief to relieve the honest but unfortunate debtor of his

indebtedness so that he may make a fresh start. *Id*. at 1129. The court must examine the facts of the particular case and weigh the totality of the circumstances in deciding whether to dismiss a case for lack of good faith. *In re Palmer*, 419 B.R. 762 (Bankr. M.D. Tenn. 2009).

> Dismissal based on lack of good faith must be undertaken on an ad hoc basis. It should be confined carefully and is generally utilized only in those egregious cases that entail concealed or misrepresented assets and/or sources of income, and excessive and continued expenditures, lavish lifestyle, and intention to avoid a large single debt based on conduct akin to fraud, misconduct, or gross negligence.

*Zick*, 931 F.2d at 1129. The following factors should be considered when making such a determination:

> 1. The debtor reduced his creditors to a single creditor in the months prior to filing the petition.
>
> 2. The debtor failed to make lifestyle adjustments or continued living an expansive or lavish lifestyle.
>
> 3. The debtor filed the case in response to a judgment[,] pending litigation, or collection action; there is an intent to avoid a large single debt.
>
> 4. The debtor made no effort to repay his debts.
>
> 5. The unfairness of the use of Chapter 7.
>
> 6. The debtor has sufficient resources to pay his debts.
>
> 7. The debtor is paying debts to insiders.
>
> 8. The schedules inflate expenses to disguise financial well-being.
>
> 9. The debtor transferred assets.
>
> 10. The debtor is over-utilizing the protection of the [Bankruptcy] Code to the unconscionable detriment to creditors.
>
> 11. The debtor employed a deliberate and persistent pattern of evading a single major creditor.
>
> 12. The debtor failed to make candid and full disclosure.
>
> 13. The debts are modest in relation to assets and income.

14. There are multiple bankruptcy filings or other procedural "gymnastics."

*Palmer*, 419 B.R. at 768 (citing *In re Eddy*, 288 B.R. 500, 504 (Bankr. E.D. Tenn. 2002)).

The Court agrees with the thought that "[d]ismissal based on lack of good faith … should be confined carefully and is generally utilized only in those egregious cases that entail concealed or misrepresented assets and/or sources of income, and excessive and continued expenditures, lavish lifestyle, and intention to avoid a large single debt based on conduct akin to fraud, misconduct, or gross negligence." *In re Baum*, 386 B.R. 649, 653 (Bankr. N.D. Ohio 2008) (quoting *Zick*, 931 F.2d at 1129).

In this case, the Court has concluded that the Creditor has failed to prove what it must to prevail under 11 U.S.C. 707(b)(3)(A). In substance, what the Court has determined happened in this case was that, because the Debtor's ex-wife concluded that she was unable to pay him the rent covering Debtor's obligations under the note with the Creditor - rent she had been paying in excess of three years - he was thus thrust into a situation of himself having to make the payments on the note out of his other resources. At that same time, he was also faced with the problem of having to move out of his then rented house, where he was living with this fiancé and one or more of his or her children, and thus having to provide alternative housing for that group. Given his income, he was not living a lavish lifestyle by any means and it appears that, with the added amounts he then had to pay to the Creditor on the note, he was faced with a genuine financial problem – one that was in one sense not wholly of his own making. After discussing the matter with his family, the decided plan of action and way of dealing with this problem was for the Debtor's daughter, who had been living in the Home with the Debtor's ex-wife, and her boyfriend, both of whom were employed at the time, to live in the Home and make the required payments on the lease/note to the Creditor and on the mobile home site rental. This situation

only lasted for a few months before the Debtor's daughter lost her job, the result being that she and her boyfriend could not make the required lease payments to the Debtor. Meanwhile, the Debtor went ahead and purchased the Grey Property and incurred a substantial V.A. mortgage loan, something he had been planning and working on for some time. This was based in part on the belief that his daughter and her boyfriend would be making the lease payments and land rental payments on the Home. It was neither dishonest nor reckless, under such circumstances, for the Debtor to have incurred this new debt. He was being forced out of his rented premises and did not live, or continue to live in a lavish lifestyle. To the contrary, the cost of the V.A. mortgage loan payments and other associated costs related to the Grey Property were less than the rent he had been paying at his rental house. Might some consider such somewhat imprudent? Maybe. However, financial imprudence (i.e.: lack of caution or due regard to consequences) is exactly what bankruptcy is designed to deal with and such does not meet the indicated tests.

To be sure, some of the specific cited, relevant factors are present in this case, but most are not. As to the former, it is fair to say that this bankruptcy filing was likely precipitated by the Creditor taking action to exercise its rights to its security and to realize on its debt, which should amount to, considering the amount it realized as a result of its foreclosure of the Home, around $30,000.00 as compared to some $8,800 of other unsecured debts owing to a single creditor. Based on his disclosures, it is clear that (1) the Debtor's income is insufficient to pay all of his debts; (2) the Debtor has not inflated his expenses; (3) this is not a case in which multiple filings are an issue; and (4) there is no indication that there has been a lack of full disclosure on the Debtor's part. Furthermore, there was not a deliberate and consistent pattern of evading payment of the debt to the Creditor. Rather, as noted, there were efforts on the part of the Debtor to do just the opposite, but those efforts did not bear fruit. In sum, the Court does not sense the

kind of unfairness or unconscionable behavior exhibited by the Debtor, which is necessary to dismiss a case for bad faith.

Creditor points to what it says was the indication, incident to granting deferral of the two delinquent payments to the end of the loan, that the Debtor would move into the Home. First, it appears likely that the deferral would have been granted absent that commitment, if indeed that commitment was made. Second, at worst, that commitment resulted only in the deferral of two monthly payments totaling some $1,000.00 or so. The entire debt would not be thereby implicated. The Creditor's strongest point is that this bankruptcy case was precipitated by its exercise of its rights under the security agreement. While likely true, it is only one of the indicia to be considered, and, as such, does not outweigh the other facts and factors. Many, if not most, personal bankruptcies involve that situation, and such does not perforce alone require dismissal under the indicated tests.

B. <u>Totality of the Circumstances under Section 707(b)(3)(B)</u>

Under § 707(b)(3)(B), when bad faith is not a factor, courts examine the totality of the circumstances in determining whether a debtor's financial situation constitutes abuse warranting dismissal. The Creditor carries the burden of establishing by a preponderance of the evidence the applicability of this ground for dismissal. In the Sixth Circuit a totality of the circumstances inquiry under § 707(b)(3)(B) involves an analysis of whether the debtor displays a lack of honesty or want of need, either of which alone may provide sufficient justification for dismissal. *See, In re* Beckerman, 381 B.R. 841 (Bankr. E.D. Mich. 2008) (interpreting *In re Krohn*, 886 F.2d 123, 126 (6th Cir. 1989)); *see also, Behlke v. Eisen (In re Behlke)*, 358 F.3d 429, 434 (6th Cir. 2004). In this case, the Creditor alleges that the Debtor displayed a lack of honesty and questions whether the Debtor is in need of Chapter 7 relief.

The Court has already determined in the bad faith analysis above that the Debtor did not act in bad faith and that he did not act dishonestly. That leaves the question of Debtor's neediness.

In determining whether a debtor is sufficiently needy to justify granting relief under chapter 7, this Court analyzes whether the debtor has an ability to repay its unsecured nonpriority creditors. *Krohn*, 886 F.2d at 126. This analysis allows consideration of both prepetition and postpetition circumstances. *U.S. Trustee v. Cortez*, 457 F.3d 448, 455 (5th Cir. 2006) ("Section 707(b) does not condition dismissal on the *filing* of bankruptcy being [an abuse] but rather on the *granting of relief*, which suggests that in determining whether to dismiss under § 707(b), a court may act on the basis of any development occurring *before* the discharge is granted"). A debtor's ability to pay is assessed by looking to the amount of disposable income the debtor has available, and whether that income could feasibly finance a chapter 13 plan of reorganization.

A debtor's "disposable income" is defined as that income received by a debtor that is not reasonably necessary to be expended for the maintenance or support of the debtor or a dependent of the debtor. 11 U.S.C. § 1325(b)(2). This determination is made by the Court, and thus, when assessing the amount of disposable income available to a debtor, the Court is not required to accept at face value the financial figures put forth by the debtor. *In re Gonzalez*, 378 B.R. 168, 173 (Bankr. N.D. Ohio 2007). Instead, in its role as trier-of-fact, the Court may make downward adjustments in a debtor's expenses where it is determined that such expenses are not reasonably necessary. *Id.* While a debtor is not required to live in poverty to defeat a § 707(b)(3) motion to dismiss, he may still be required to engage in some good, old-fashioned belt tightening. *Krohn*, 886 F.2d at 128.

13

12-58870-wsd    Doc 77    Filed 11/26/14    Entered 11/26/14 10:29:43    Page 13 of 15

The Creditor argues that the Debtor has sufficient resources to pay his debts. Specifically, the Creditor claims that (1) the Debtor has the ability to work additional overtime and that, along with his fiancé's income if she were to get a job, he could easily afford to pay his debts; (2) the Debtor could do some belt tightening, specifically with regard to his monthly expenses for cable and internet ($120.00), cellular phones ($265.00), transportation ($550.00), laundry and dry cleaning ($80.00), haircuts and toiletries ($60.00), and food ($700.00). The Debtor argues that (1) the budget he provided in his Schedules I and J relies on overtime, which was included at an averaged amount in his gross income figure on his Schedule I; (2) his Schedule J shows that he has $0 of disposable income left over after he pays the necessary and reasonable expenses for his family; (3) his fiancé was not working and he was supporting his daughter, his fiancé, and his fiancé's daughter; (4) he has two adult children that periodically resided with him; (5) there is no room in his budget for significant belt tightening given that his food expenses are reasonable for his family size, he has modest car payment, he listed only $15.00 per month for recreation expenses, and he has not listed any retirement deduction on his Schedule I.

Based on the foregoing, the Court concludes that the Debtor does not have sufficient income to pay his debts and that he did not inflate his expenses. The Court further concludes that the Debtor would not likely be successful in a Chapter 13 case. Accordingly, the Court concludes that the Creditor has failed to meet its burden under 11 U.S.C. § 707(b)(3)(B).

### III. CONCLUSION

For the reasons stated herein, the Creditor's Motion to Dismiss the Debtor's case pursuant to 11 U.S.C. § 707(b)(3)(A) and (B) is DENIED. Counsel for the Debtor shall prepare and present an order consistent with this Opinion.

**Signed on November 26, 2014**

                                                            **/s/ Walter Shapero**
                                           **Walter Shapero**
                                           **United States Bankruptcy Judge**

15

12-58870-wsd    Doc 77    Filed 11/26/14    Entered 11/26/14 10:29:43    Page 15 of 15